940 F.2d 948
 GULF ISLAND, IV, a Louisiana Partnership, and Gulf Island,
IV, Inc., Plaintiffs-Appellants,
v.
BLUE STREAK MARINE, INC., Blue Streak Offshore, Inc., and
Blue Streak Operations, Inc., Defendants-Third
Party Plaintiffs-Appellants,
v.
EMPLOYERS INSURANCE OF WAUSAU, Defendant-Appellee,
and
Underwriters at Lloyd's London subscribing to Policy #
MC9792SAH, Defendant-Appellee-Third Party
Defendant-Appellee.
 No. 90-3564.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 10, 1991.
 
 John T. Nesser, III, Liane C. King, Nesser, King & LeBlanc, New Orleans, La., for Gulf Island IV, etc.
 Steven J. Koehler, Richard K. Leefe, Leefe, Donelon, Donelon & Koehler, Metairie, La., for Blue Streak, et al.
 Charles M. Steen, James H. Roussel, Phelps, Dunbar, New Orleans, La., for Underwriters.
 James M. Tompkins, Gerry Deegan, Galloway, Johnson, Tompkins & Burr, New Orleans, La., for employers.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before REAVLEY, POLITZ and JOLLY, Circuit Judges.
 E. GRADY JOLLY, Circuit Judge:
 
 
 1
 Gulf Island IV is the owner of the vessel L/B GULF ISLAND IV. Blue Streak Marine, Inc., is the vessel's operator. Each appeal the district court's order granting summary judgment to Employers Insurance of Wausau and to Underwriters at Lloyd's, London. These insurance companies denied coverage for loss of use of, and unpaid property damage to, the GULF ISLAND IV after it capsized in the Gulf of Mexico. The district court entered separate judgment for each of the insurers, holding that the insurance policies did not cover the claims. Our review of the undisputed facts and the policies lead us to affirm as to Wausau. With respect to Lloyd's, however, we find that remand is necessary.
 
 
 2
 * This appeal arises from the district court's separate orders granting summary judgment in favor of the two above-named insurance companies. The factual background is the same. On June 28, 1985, the GULF ISLAND IV suffered severe damage when one of its jackup legs collapsed, causing it to capsize off the coast of Texas in the Gulf of Mexico.[1] At the time of the accident, the vessel was owned by Gulf Island IV, a Louisiana general partnership.[2] The vessel, however, was being operated by another partnership collectively known as Blue Streak Gulf Island Operations ("BS-GIO").[3] On the date of the loss, the vessel was covered by two insurance policies issued by Employers Insurance of Wausau. One was a Hull policy, and the other was a policy of Protection & Indemnity insurance ("P & I"). Both policies listed the named assured as: Gulf Island Marine, Blue Streak Gulf Island Marine Operations, Inc., Oceanic Fleet, Inc.; all were listed at a single Baton Rouge address. The policies also listed the GULF ISLAND IV on its schedule of covered vessels.
 
 
 3
 Finally, also in effect at the time of the accident was an umbrella policy issued by Underwriters at Lloyd's, London, through its local agent, Pateman's Underwriters.
 
 
 4
 Following the accident, by July 2, 1985, Gulf Island had promptly presented various claims to Wausau under the Hull policy, seeking payment for property damage and recompense for all personal injury claims. Wausau and American Marine Underwriters[4] participated actively in the investigation of the casualty. American Marine immediately appointed counsel and a marine surveyor to represent its interests during the investigation and vessel repair periods subsequent to the casualty. There was an extensive investigation by the interested parties (except for Lloyd's). Naval architects, mechanical engineers, and metallurgists were retained by and on behalf of Gulf Island, Wausau and American Marine to investigate scientifically the causes of the casualty. Ultimately, Wausau paid some of the claims, but, at least initially, denied or delayed paying others.
 
 
 5
 As a result of Wausau's partial non-payment, on December 16, 1985, Gulf Island sued Wausau and American Marine Underwriters, alleging that the damage was caused by the negligent loading or handling of cargo on the vessel and/or by negligence of its crew. That suit sought declaratory judgment that the damage was covered by the Hull policy; sought penalties under La.R.S. 22:658 for Wausau's arbitrary refusal to pay the claims within 60 days; and sought damages for loss of use of the vessel after the hurricane incident because of Wausau's refusal to pay for certain repairs in early October 1985.
 
 
 6
 Thereafter, a settlement of all claims involved was apparently reached in consideration of substantial payments by Wausau to Gulf Island under the Hull policy and to third parties under the P & I policy. Accordingly, on September 26, 1986, the district court entered a sixty-day order of dismissal.[5] On October 6, 1986, counsel for Gulf Island wrote Wausau's counsel:
 
 
 7
 This confirms that the referenced suit has been settled, and we have agreed to a dismissal in exchange for a payment in the amount of $1,000.00.
 
 
 8
 I assume that you will prepare the necessary settlement papers and forward them to me along with the necessary settlement draft.
 
 
 9
 On November 10, 1986, Wausau cut a check to Gulf Island in the sum of $1,000.00 and sent the check and a receipt-and-release to same. Gulf Island, however, failed to sign the release or to return the check and the instant litigation followed.
 
 II
 
 10
 On June 27, 1988, Gulf Island filed the present suit for loss of use of the GULF ISLAND IV and for property damage not reimbursed by the other insurance.[6] Blue Streak, in turn, filed a cross-claim against Wausau for indemnity of any judgment Gulf Island may obtain against any of them, and a third party complaint against Lloyd's, as its alleged excess insurer.
 
 
 11
 Wausau thereafter filed a motion for summary judgment, asserting a number of reasons why its P & I policy did not provide coverage. The district court granted the motion, holding that the GULF ISLAND IV was a "scheduled vessel" in the P & I policy.
 
 
 12
 Subsequently, Lloyd's also filed a motion for summary judgment, asserting numerous reasons why its umbrella policy did not provide coverage, and arguing that the claims and third-party claims were barred by the doctrine of laches. The district court found that, although Gulf Island gave prompt notice of the June 1985 accident to Wausau and American Marine Underwriters,[7] Pateman's Underwriters (Lloyd's) did not receive any notice of the accident, or of any potential claims from the accident, until service was made of the Louisiana Secretary of State on November 28, 1989. At the earliest, therefore, the district court concluded that Lloyd's did not receive notice until over four and one-half years after the accident. The district court granted Lloyd's motion for summary judgment, holding that a failure to comply with the notice provision of the policy barred all claims.
 
 
 13
 The district court, pursuant to Fed.R.Civ.P. 54(b), entered a partial final judgment in favor of Wausau and Lloyd's. Gulf Island and Blue Streak appeal.
 
 III
 
 14
 * Our review of the district court's decision granting summary judgment is de novo. Amoco Prod. Co. v. Lujan, 877 F.2d 1243 (5th Cir.1989); Degan v. Ford Motor Co., 869 F.2d 889 (5th Cir.1989). We must determine whether the evidence, viewed in the light most favorable to Gulf Island and Blue Streak, shows that there is no genuine issue of material fact, and that Wausau and Lloyd's are entitled to judgment as a matter of law. Brock v. Republic Airlines, Inc., 776 F.2d 523, 527 (5th Cir.1985); John v. State of Louisiana (Bd. of Trustees for State Colleges and Univ.), 757 F.2d 698 (5th Cir.1985). In reviewing the summary judgment award, however, we are free to affirm the dismissal on any ground presented to the district court for consideration, even though it may not have formed the basis for the district court's decision. Riley Inv. Co. v. Commissioner, 311 U.S. 55, 59, 61 S.Ct. 95, 97, 85 L.Ed. 36 (1940); Church of Scientology v. Cazares, 638 F.2d 1272, 1281 (5th Cir.1981).
 
 
 15
 Moreover, in construing the marine insurance policies at issue, Louisiana rules of construction are applicable. See Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955); Truehart v. Blandon, 884 F.2d 223, 226 (5th Cir.1989); Transco Exploration Co. v. Pacific Employers Ins., 869 F.2d 862, 863 (5th Cir.1989). Louisiana law provides that insurance contracts are to be construed "as a whole, and one portion thereof should not be construed separately at the expense of disregarding another." Pareti v. Sentry Indemnity Co., 536 So.2d 417, 420 (La.1988). Further, the terms of insurance contracts must be construed in their usual and ordinary sense. Calcasieu-Marine National Bank of Lake Charles v. American Employers' Insurance Co., 533 F.2d 290, 295 (5th Cir.1976). Finally, if an ambiguity exists in the policy, then the ambiguous policy provision is to be construed against the insurer. La.Civ.Code art. 2056; Breland v. Schilling, 550 So.2d 609, 910 (La.1989).
 
 B
 
 16
 We first address whether the district court erred in granting Wausau's motion for summary judgment. All parties agree that, because the collapse of the GULF ISLAND IV was not caused by a collision, Article (5) of the Wausau P & I policy governs the coverage issues. The parties, however, offer differing interpretations of that provision. The relevant terms of the policy are as follows:
 
 
 17
 The Assurer herby [sic] undertakes to make good to the Assured or the Assured's executors, administrators and/or successors, all such loss and/or damage and/or expense as the Assured shall as owners of the vessel named herein have become liable to pay and shall pay on-account of the liabilities, risks, events and/or happening herein set forth:
 
 
 18
 * * * * * *
 
 
 19
 (5) Liability for loss of or damage to any other vessel or craft, or to property on such other vessel or craft, not caused by collision, provided such liability does not arise by reason of a contract made by the assured.
 
 
 20
 Where there would be a valid claim hereunder but for the fact that the damaged property belongs to the Assured, the Assurer shall be liable as if such damaged property belonged to another, but only for the excess over any amount recoverable under any other insurance applicable on the property.
 
 
 21
 (Emphasis added). The district court determined that the first sentence of Art. (5), by its express language, extends coverage only to "other vessels or crafts." As we have noted, GULF ISLAND IV was a scheduled vessel under the policy. The district court explained that Art. (5) provides coverage only when two vessels are involved, as opposed to one vessel:
 
 
 22
 While the legal fiction of deeming the damaged vessel to belong to someone other than the Assured works where the damaged vessel and the scheduled vessel at issue are distinct, the fiction fails when the two vessel(s) are the same. Applying the fiction in such circumstances would render the "as owners of the vessel" language meaningless. If a damaged scheduled vessel is to be considered as belonging to someone other than the Assured, then perforce the Assured cannot be liable "as owners of the vessel" for that damage and thus no derivative liability can attach to Wausau.
 
 
 23
 The district court determined that the GULF ISLAND IV was listed on the "Schedule of Vessels" insured under the policy. As a result, the district court concluded that the GULF ISLAND IV was not an "other vessel" within the meaning of Art. (5), and denied coverage.
 
 
 24
 (1)
 
 
 25
 Gulf Island attacks the district court's opinion on two levels. First, Gulf Island argues that the Wausau policy, as indicated by the cover sheet to the policy, insured Blue Streak Gulf Island Marine Operations, Inc. as the "operator" of the vessel, not as the "owner." This distinction is important, so the argument goes, because if the policy insures Blue Streak as the operator of the GULF ISLAND, rather than as the owner, then that vessel would be an "other vessel" with respect to the owner, Gulf Island. We find this argument at best confusing. Nevertheless, we recognize Gulf Island to be arguing that Wausau agreed to insure the operator of the vessel in its operating capacity, and should not now be allowed to deny coverage for the operator's liability.
 
 
 26
 To that end, Gulf Island would thus have this court substitute the phrase "as operator" in place of the words "as owners" in the introductory clause to Art. (5). That clause would then read:
 
 
 27
 The Assurer herby [sic] undertakes to make good to the Assured ... all such loss and/or damage and/or expense as the Assured shall as operator of the vessel named herein have become liable to pay and shall pay on-account of the liabilities, risks, events and/or happening herein set forth:
 
 
 28
 The effect of this substitution, argues Gulf Island, is that Art. (5) should be interpreted as providing coverage for damage caused by Blue Streak as the operator of the scheduled vessel. Gulf Island concludes that such a change "provides meaning to the terms of the policy, and does not render any phrase meaningless." Again, this proffered rationale is less than lucid given the remaining terms of Art. (5) of the policy.
 
 
 29
 In any event, however, we have no authority under Louisiana law to alter the terms of policies, under the guise of contractual interpretation, where the policy provisions are couched in unambiguous language. Pareti v. Sentry Indem. Co., 536 So.2d 417 (La.1988); Graham v. Equity Nat. Life Insurance Co., 373 So.2d 988, 991 (La.App.3rd Cir.1979). Because the policy terms unambiguously relate to "owners," as opposed to "operators," we have no authority to alter its plain meaning.
 
 
 30
 Gulf Island, the vessel's owner, admits that it is a named assured under the policy, and that the GULF ISLAND IV is listed as an additional assured. Article (5) clearly states that the owner of the vessel is only covered for losses that occur to other vessels. Even were we to interpret the introductory clause to Art. (5) as applying to the assured as "operator," the extent of coverage is still defined by Art. (5), which applies only to "other vessels," a class to which Gulf Island, a vessel named in the policy, does not belong. See infra. We conclude, therefore, that Gulf Island's first argument is without merit.
 
 
 31
 (2)
 
 
 32
 Gulf Island argues further that the district court erred when it interpreted "damaged property" in the second sentence of Art. (5) as being limited to property damage on the other vessel, thereby excluding the damage to the GULF ISLAND IV. As indicated previously, the second sentence of Art. (5) reads:
 
 
 33
 Where there would be a valid claim hereunder but for the fact that the damaged property belongs to the Assured, the Assurer shall be liable as if such damaged property belonged to another, but only for the excess over any amount recoverable under any other insurance applicable on the property.
 
 
 34
 In interpreting the meaning of "damaged property," Gulf Island points to the language contained on the first page of the policy which sets forth the general insuring agreement:
 
 
 35
 In consideration of the stipulations herein named and of the premium above specified, the Company does insure the above Named Assured, hereinafter called the Assured, whose address is shown above, from the inception date shown above, at a place of issuance to an amount not exceeding the amount(s) above specified, on the property described below or in Schedule attached.
 
 
 36
 Gulf Island stresses that the word "property" is defined by the policy as including the "Schedule of Vessels." Because the GULF ISLAND IV is included in the schedule of vessels, Gulf Island argues, it is "property" as contemplated under Art. (5), and therefore covered by the policy. Gulf Island concludes that, even though the "damaged property," i.e., the GULF ISLAND IV, belongs to Gulf Island, an assured, Wausau is liable, under the second sentence of Art. (5), "as if such damaged property belonged to another," at least for the excess over any amount recoverable under any applicable insurance.[8] We are unpersuaded.
 
 
 37
 The first sentence of Art. (5), we hold, clearly limits the extension of coverage to damage to "other vessels" (see supra p. 953), that is, vessels other than those insured under its policy. (This was, after all, a P & I policy, not a hull policy.) As the district court noted, although the policy does not define the term "other vessel ... it is beyond cavil that the term refers to vessels other than those insured under the policy or, in other words, that the term refers only to non-scheduled vessels." There is no question that the GULF ISLAND IV is a scheduled vessel in the policy. Therefore, it is not an "other vessel" within the meaning of Art. (5). The first sentence thus excludes from coverage any damage to the GULF ISLAND IV.
 
 
 38
 The second sentence does not alter the meaning or effect of the term "other vessel" in the first sentence. The second sentence, we conclude, provides for coverage where there is non-collision property damage "on such other vessel or craft" when that damaged property is owned by the assured; but only where the assured would have been liable for damage to that property had it belonged to anyone other than the assured. For example, if the assured's property on board "another vessel" is damaged through a scheduled vessel's negligence, the policy will pay the assured these damages for which it would have been liable, as owner of the negligent vessel, to a third party.
 
 
 39
 Finally, we are unpersuaded that the word "property" as used in the second sentence of Art. (5) is defined in the beginning of the contract to include "Scheduled Vessels." The district court found that the P & I policy did not provide coverage for damages sustained by the GULF ISLAND IV because of the limiting language contained in Art. (5). The district court observed that:
 
 
 40
 [T]he introductory clause does not use broad, hull-policy-type wording such as: 'Wausau shall be liable for loss of or damage to....' Instead, the introductory clause is more narrowly confined; it states that Wausau shall provide coverage only to the extent the Assured are liable 'as owners of the vessel.' This distinction--the 'constrictive effect of this language,' Continental Oil Co. v. Bonanza Corp., 706 F.2d 1365, 1371 (5th Cir.1983) (en banc), which is the touchstone for identifying most marine P & I policies--is critical.
 
 
 41
 We agree and conclude that "damaged property" in the second sentence modifies and relates to the preceding sentence, which separates "vessel" from "property." We thus hold that the second sentence of Art. (5) applies only to "damaged property" that was aboard the "other vessel," and does not apply to the vessel itself. In short, Art. (5) of the Wausau policy does not extend coverage to the damage sustained by the GULF ISLAND IV.[9]
 
 C
 
 42
 We next turn to whether the district court erred in granting summary judgment to Lloyd's. The district court, relying on MGIC Indemnity Corp. v. Central Bank of Monroe, 838 F.2d 1382 (5th Cir.1988) and Auster Oil & Gas, Inc. v. Stream, 891 F.2d 570 (5th Cir.1990), held that all claims for insurance coverage were barred because Blue Streak and Gulf Island failed to give timely notice as required by the terms of the umbrella policy. The notice provision in the umbrella policy states that:
 
 
 43
 THIS POLICY IS SUBJECT TO THE FOLLOWING CONDITIONS:
 
 
 44
 G. NOTICE OF OCCURRENCE--
 
 
 45
 Whenever the Assured has information from which the Assured may reasonably conclude that the occurrence covered hereunder involves injuries or damages which, in the event that the Assured should be held liable is likely to involve this policy, notice shall be sent as stated in item 4 of the Declarations as soon as practicable, provided however, that failure to give notice of any occurrence which at the time of its happening did not appear to involve this policy but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims.
 
 
 46
 The district court interpreted this provision as making "prompt notice of actual or potential claims to [Lloyd's] a condition precedent to an assured's rights under their policy." The district court, concluding that Blue Streak and Gulf Island were both insureds under the umbrella policy, held that their failure to provide notice to Lloyd's barred any recovery, regardless of any prejudice. See MGIC; Auster Oil, supra.
 
 
 47
 (1)
 
 
 48
 In MGIC Indemnity Corp. v. Central Bank of Monroe, supra, we held that when prompt notice of a covered occurrence is a "condition precedent" to recovery under an insurance policy, and the insured fails to give such notice, the claim is no longer covered by the policy, regardless of whether the insurer can demonstrate prejudice. 838 F.2d at 1385-87. In MGIC, the policy provided:
 
 
 49
 6(b) The Bank or Directors or Officers shall, as a condition precedent to their rights under this policy, give to the Insurer notice in writing as soon as practical of any claims made and shall give the Insurer such information and cooperation as it may reasonably require.
 
 
 50
 Id. at 1385 (emphasis added). In that case, we held that the words "condition precedent" mean exactly what they say, and failure to comply with this provision precluded recovery, regardless of whether prejudice was shown. 838 F.2d at 1385-86. In so holding, the MGIC court distinguished those Louisiana cases that require a showing of prejudice before recovery will be barred, noting that the policies in those cases did not contain express "condition precedent" terms. See, e.g., Barnes v. Lumbermen's Mutual Cas. Co., 308 So.2d 326 (La.Ct.App.1975); Heimbaugh v. Federal Ins. Co., 281 So.2d 839 (La.Ct.App.1973), appeals denied, 283 So.2d 771, 772 (La.1973).
 
 
 51
 In Auster Oil, we reaffirmed the MGIC court's holding that condition precedent language precluded an insured from recovering under the policy when the insured did not comply with the notice requirement. We went on to hold, however, that the claim of the injured third party (as opposed to the insured) was in a different category: although an insurer may oppose a third party claim on grounds that the insured failed to provide proper notice, the defense will be successful only if the insurer can demonstrate a "very clear case" of prejudice. 891 F.2d at 579.
 
 
 52
 The notice provisions in MGIC and Auster Oil differ substantially from the one at bar.[10] The Lloyd's policy requires notice only when the assured "may reasonably conclude" that a covered occurrence has taken place. This language falls short of the express condition precedent language that we held in MGIC and Auster Oil was necessary to make giving notice a condition precedent to recovery. To be sure, Lloyd's policy states that "failure to give notice of any occurrence which at the time of its happening did not appear to involve this policy but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims." Indeed, at oral argument, counsel for Lloyd's conceded that the policy terms did not make timely notice a condition precedent to recovery. We thus conclude that the district court erred in holding that under this policy timely notice was a condition precedent to recovery, and, consequently, erred in excluding coverage on the absence of timely notice.
 
 
 53
 (2)
 
 
 54
 This holding, of course, does not end our inquiry. Louisiana law states that where notice is not a condition precedent to recovery, an insurer may still avoid liability by showing that the insured's failure to give timely notice caused prejudice. See, e.g., Barnes v. Lumbermen's Mutual Cas. Co.; Heimbaugh v. Federal Ins. Co., supra. In dicta, the district court below indicated that Lloyd's was indeed prejudiced by the four-year delay:
 
 
 55
 More importantly, the uncontradicted evidence in the record supports the summary judgment finding that the over-four year delay has caused prejudice to Pateman's Underwriters in asserting a critical defense, namely, causation of the causality. With no notice, Pateman's Underwriters were denied an opportunity open to and taken by both Gulf Island-IV and those insurers that did have notice, namely, the opportunity to send out their own marine surveyors, mechanical engineers, naval architects, or any of the other myriad of experts that these parties sent out just after the casualty and before the vessel underwent repairs--repairs that necessarily and undeniably destroyed the bulk of this extrinsic evidence of the damaged jackup leg. In short, the long passage of time, Pateman's Underwriters have shown a 'loss of evidence and a[ ] difficulty raised up in the way of preparing a defense.'
 
 
 56
 (Citations omitted). We find this statement, although having some intuitive appeal, to be overly broad and without adequate development in the record. It is indeed true that the record is replete with references to the number and type of experts that were engaged by the original parties involved immediately following the accident. However, there is insufficient summary judgment evidence that Lloyd's, by not having the opportunity to send in its own experts, or otherwise by not being notified for over four years, has been prejudiced. Nor do we find the district court's assertions that the experts who actually examined the damaged leg and vessel had interests sufficiently divergent from Lloyd's as to cause it prejudice. In short, we find the record incomplete with respect to the issue of prejudice to Lloyd's. Accordingly, we must reverse the summary judgment of the district court, and remand for further proceedings with respect to the prejudice, if any, that Lloyd's has suffered as a result of Gulf Island's and Blue Streak's delay in notifying it of their claims.[11]IV
 
 
 57
 For the foregoing reasons, the district court's judgment with respect to Wausau is AFFIRMED. However, its judgment with respect to the Lloyd's policy is REVERSED and REMANDED for further proceedings not inconsistent with this opinion.
 
 
 58
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 [1]
 In October of 1985, the vessel suffered additional damage from Hurricane Juan. Neither incident was caused by a collision
 
 
 [2]
 The sole partners of Gulf Island IV are Gulf Island IV, Inc., and Gulf Island Marine, Inc., with Gulf Island Marine, Inc. designated as the general partner
 
 
 [3]
 The sole partners of BS-GIO were Blue Streak Operations, Inc. (as managing partner), and Gulf Island Operations, Inc. Gulf Island Operations was, during all pertinent times, a subsidiary of Gulf Island Marine. Although there was some initial confusion as to who controlled the GULF ISLAND IV, the plaintiff now concedes that the BS-GIO alone had care, custody and control over the vessel during the time of the accident. Apparently, BS-GIO has been subsequently dissolved, and Blue Streak Operations, which was one of BS-GIO's partners, is now being sued for BS-GIO's liabilities; and Blue Streak Marine and Blue Streak Offshore are being sued as successors to BS-GIO's liabilities and/or as alter egos of BS-GIO
 
 
 [4]
 American Marine Underwriters appears to be the local underwriting agent for Wausau. They were named in the original suit filed in the district court, styled Gulf Island IV v. American Marine Underwriters and Employers Insurance of Wausau, et al. American Marine is not a party to this appeal
 
 
 [5]
 That order stated:
 The Court having been advised by counsel for the parties that the above action has settled;
 IT IS ORDERED that this action is hereby dismissed without costs and without prejudice to the right, upon good cause shown within sixty (60) days, to reopen the action if settlement is not consummated.
 
 
 [6]
 Named as defendants were the four identified Blue Streak entities (Blue Streak Marine, Inc.; Blue Streak Offshore, Inc.; Blue Streak Operations, Inc.; and BS-GIO) and, under Louisiana's Direct Action Statute, Sec. 22:655, Wausau and Pateman's Underwriters
 
 
 [7]
 One month after the GULF ISLAND IV had capsized, Gulf Island provided written notice of its claim to Wausau. Although there was evidence indicating that Gulf Island knew about the umbrella policy issued by Lloyd's within a few months after the accident, it did not give Lloyd's notice of the present claim until four years later
 
 
 [8]
 Blue Streak joins in Gulf Island's interpretation of Art. (5), and further argues that the district court erred in focusing its attention exclusively on Art. (5) without considering the P & I policy as a whole, or the other insurance referred to in that policy. As Blue Streak points out, it and Gulf Island had purchased numerous insurance policies, including a Hull policy and a P & I policy from Wausau as well as an umbrella policy from Lloyd's. These policies referred to each other in determining the extent of coverage. According to Blue Streak, this suggests that its intention and that of Gulf Island was to insure all potential risks, including the risk that one insured would have a claim against another. The district court, however, rejected this argument, finding "no objective evidence that the parties intended Wausau's P & I policy to provide not only protection and indemnity for damage to non-scheduled vessels, but also coverage in the form of an excess hull policy for scheduled vessels."
 
 
 [9]
 Wausau requests that we impose sanctions against Gulf Island for pursuing an allegedly frivolous appeal. The grounds for this appeal, however, do not appear so baseless as to merit such relief
 
 
 [10]
 Gulf Island also argues that MGIC and Auster Oil are distinguishable because it is not a named insured under the umbrella policy by virtue of the fact that it cannot be both a named insured under the Wausau P & I policy and an additional insured under the umbrella policy issued by Lloyd's. We do not reach this issue, however, because we find that the language in the Lloyd's policy did not make notice a condition precedent
 
 
 [11]
 Of course, the district court's summary judgment award may be affirmed on other grounds asserted by Lloyd's. Lloyd's other arguments are in sum: (1) the umbrella policy does not cover any damages associated with the GULF ISLAND IV because the vessel was in Blue Streak's "care, custody or control" at the time of the accident; (2) the umbrella policy does not provide coverage because it incorporates the terms of Wausau's P & I policy, including article 5, which was held to not apply to the GULF ISLAND IV; and (3) the umbrella policy does not provide coverage because it limits recoverable property damages to "loss of ... tangible property (other than property owned by the named assured)", and Gulf Island is a named insured under the policy
 We find none of these arguments, for the reasons discussed in the footnote in the district court's opinion, to warrant summary judgment at this time. However, our opinion should in no way be interpreted as precluding the district court from reconsidering these reasons and granting summary judgment thereon should it be so inclined upon remand.